## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY

———————————————————— )
)
**FORESIGHT COAL SALES LLC,** )
) **Case No. _____**
Plaintiff, )
)
v. )
)
**MICHAEL SCHMITT,** *in official capacity as* )
*Chairman and Commissioner of Kentucky Public* )
*Service Commission;* )
**KENT CHANDLER,** *in official capacity as Vice* )
*Chairman and Commissioner of Kentucky Public* )
*Service Commission;* )
**TALINA MATHEWS,** *in official Capacity as* )
*Commissioner of Kentucky Public Service* )
*Commission;* )
**LINDA BRIDWELL,** *in official capacity as* )
*Executive Director of the Kentucky Public* )
*Service Commission,* )
)
Defendants. )
———————————————————— )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## CHALLENGING CONSTITUTIONALITY OF STATE LAW

1.     Kentucky has once again adopted a law that alters the interstate market for

thermal coal in a manner that benefits coal producers in states, like Kentucky, that impose coal

severance taxes, while burdening those in states, like Illinois, that do not impose a coal severance

tax.

2.     Kentucky's latest protectionist effort is by no means new. Indeed, it is the State's

third attempt to enact a law to prop up its declining coal industry by shielding it from the rigors

of competition in the interstate market. But this attempt fares no better than the first two, and—as

the nation celebrates baseball's opening day—Foresight asks this Court to call strike three.

**PARTIES**

3.     Plaintiff Foresight Coal Sales LLC ("Foresight") sells coal produced in Illinois.

4.     Foresight is a limited liability company formed under the laws of the state of Delaware.

5.     Foresight sells coal to coal-fired electric utilities that are regulated by Kentucky's Public Service Commission (the "PSC").

6.     Foresight regularly submits proposals or "bids" in response to requests for proposal, or "RFPs," issued by regulated utilities.

7.     Foresight's Illinois-produced coal directly competes with coal produced in Kentucky and other states for these regulated utilities' coal-supply contracts.

8.     The PSC directly regulates the award of regulated utilities' coal supply contracts through its laws and regulations, including 807 Ky. Admin. Regs. 5:056, the Fuel Adjustment Clause (the "FAC").

9.     The PSC is an administrative agency of the Kentucky state government tasked with the statutory responsibility of regulating utilities and enforcing the provisions of KRS Chapter 278.

10.    Specifically, the PSC is charged with the "regulation of rates and service of utilities," and is given broad authority to determine whether rates are "fair, just, and reasonable." Ky. Rev. Stat. § 278.040; Ky. Rev. Stat. § 278.2207.

11.    The PSC is located at 211 Sower Boulevard, Frankfort, Kentucky 40602-0615.

12.    The PSC is "a body corporate, with power to sue and be sued in its corporate name." Ky. Rev. Stat. § 278.040.

2

13.     Defendant Michael Schmitt is sued in his official capacity as Chairman and Commissioner of the PSC, located in Frankfort, Kentucky.

14.     Chairman Schmitt is charged as "chief executive officer" of the PSC under Ky. Rev. Stat. § 278.050(2).

15.     Chairman Schmitt has state executive authority, including the administration and enforcement of Chapter 278 of the Kentucky statute, through his role in the PSC, including its promulgation and enforcement of 807 Ky. Admin. Regs. 5:056, the FAC.

16.     Defendant Kent Chandler is sued in his official capacity as Vice Chairman and Commissioner of the PSC, located in Frankfort, Kentucky.

17.     Vice Chairman Chandler is charged with state executive authority, including the administration and enforcement of Chapter 278 of the Kentucky statute, through his role in the PSC, including its promulgation and enforcement of 807 Ky. Admin. Regs. 5:056, the FAC.

18.     Defendant Talina Mathews is sued in her official capacity as Commissioner of the PSC, located in Frankfort, Kentucky.

19.     Commissioner Mathews is charged with state executive authority, including the administration and enforcement of Chapter 278 of the Kentucky statute, through her role in the PSC, including its promulgation and enforcement of 807 Ky. Admin. Regs. 5:056, the FAC.

20.     Defendant Linda Bridwell is sued in her official capacity as Executive Director of the PSC, located in Frankfort, Kentucky.

21.     Director Bridwell is charged as "chief administrative officer" of the PSC and responsible for, among other things, implementing the programs and directing the staff under Ky. Rev. Stat. § 278.100.

22.     Director Bridwell has state executive authority, including the administration and enforcement of Chapter 278 of the Kentucky statute, through her role in the PSC, including its promulgation and enforcement of 807 Ky. Admin. Regs. 5:056, the FAC.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 2201–02, and 1343.

24.     This Court has personal jurisdiction over the parties because the PSC is located in the Eastern District of Kentucky and the relevant acts occurred in the Eastern District of Kentucky.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## LEGAL BACKGROUND

26.     The Framers "intended the Commerce Clause as a way to preserve economic union and to suppress interstate rivalry." *Dennis v. Higgins*, 498 U.S. 439, 453 (1991) (Kennedy, J., dissenting). Because the Commerce Clause "was intended to benefit those who are engaged in interstate commerce," those entities are protected by the Constitution from unwarranted interference at a state's border. *Id.* at 449 (citation omitted).

27.     In its "dormant" form, the Commerce Clause limits the power of states "to erect barriers against interstate trade." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980).

28.     Courts evaluate Dormant Commerce Clause challenges through a two-tiered analysis.

29.     *First*, a court determines whether "a state statute directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). If a state law does either, it is "generally struck down . . . without

4

further inquiry." *Id.*; *see also Dep't of Revenue of Ky. v. Davis,* 553 U.S. 328, 338 (2008); *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644–50 (6th Cir. 2010).

30.     *Second*, if the "statute has only indirect effects on interstate commerce and regulates evenhandedly," a court moves on to the application of the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *See Brown–Forman*, 476 U.S. at 579. The so-called "*Pike* balancing test" directs a court to invalidate a state law only if the burden it imposes upon interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142; *Boggs*, 622 F.3d at 644–50.

31.     The Dormant Commerce Clause's "core concern" is protectionism—"that is, differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Boggs*, 622 F.3d at 644–45. "Protectionist laws are generally struck down without further inquiry, because absent an extraordinary showing the burden they impose on interstate commerce will always outweigh their local benefits." *Id.* at 645 (citation omitted).

32.      Under the first prong of the Dormant Commerce Clause analysis, a "protectionist" state law "can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *E. Ky. Res. v. Fiscal Court of Magoffin County*, 127 F.3d 532, 540 (6th Cir. 1997).

33.     A law discriminates "facially" based on the language of the regulation or statute itself. In particular, a law facially discriminates against interstate commerce when it "explicitly deprives certain products of generally available beneficial . . . treatment because they are made in certain other States." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 274 (1988).

34.     Such a law is facially discriminatory even when it does not burden *all* out-of-state products or interests.

35.     In *Limbach*, for example, an Indiana ethanol producer challenged an Ohio law that "award[ed] a tax credit against the Ohio motor vehicle fuel sales tax for each gallon of ethanol sold . . . by fuel dealers, but only if the ethanol is produced in Ohio or in a State that grants similar tax advantages to ethanol produced in Ohio." *Id.* at 271. The Ohio law thus extended favorable treatment to Ohio ethanol producers or to producers from any state with a similar tax system (*i.e.*, states that offered credits to Ohio-produced ethanol). For this reason, the *Limbach* defendants argued:

> [T]he availability of the tax credit to *some* out-of-state manufacturers (those in States that give tax advantages to Ohio-produced ethanol) shows that the Ohio provision, far from discriminating against interstate commerce, is likely to promote it, by encouraging other States to enact similar tax advantages that will spur the interstate sale of ethanol.

*Id.* at 274 (emphasis added).

36.     A unanimous Supreme Court, in an opinion authored by Justice Scalia, rejected this contention. Instead, the Court held that the law "*on its face* appears to violate the cardinal requirement of nondiscrimination" by "explicitly depriv[ing] certain products of generally available beneficial . . . treatment because they are made in certain other States" (*i.e.*, those that did not give tax advantages to Ohio-produced ethanol).  *Id.*

37.     The *Limbach* Court further noted that the challenged law placed certain out-of-state products "at a substantial commercial disadvantage through discriminatory . . . treatment" such that the plaintiff, which operated in a state that did not offer tax advantages to Ohio-produced ethanol, would have "to cut its profits by reducing its sales price below the market price sufficiently to compensate the Ohio purchaser-retailer for the forgone tax credit." *Id.* at 275.

38.     As such, the Court concluded that the challenged law was facially discriminatory. *Id.* And it reached this conclusion notwithstanding the "reciprocity" Ohio offered to other states. In other words, Ohio's "promise to remove" the law's "economic disadvantage upon out-of-state sellers" if their states accepted reciprocity (*i.e.*, agreed to extend similarly favorable treatment to Ohio ethanol producers) could not save the law. *Id.*

39.     A law discriminates "purposefully" based on statements of legislative intent or other outside sources where intent can be discerned, including legislative or regulatory history. *See, e.g.*, *River Oaks Mgmt., LLC v. Brown*, No. CIV.A.3:06CV00451-S, 2007 WL 2571909, at *4–6 (W.D. Ky. Sept. 4, 2007) (noting, with respect to "purposeful" discrimination, that, "where other sources, other than the state's own self-serving statement of its legislative intent, indicate the presence of actual and discriminatory purposes, a state's discriminatory purpose can be ascertained from [those] sources").

40.     And a law discriminates "in practical effect" depending on whether and to what extent it favors local economic actors and burdens out-of-state actors. *See, e.g.*, *Boggs*, 622 F.3d at 644–50 (citing cases).

41.     "Where simple economic protectionism is effected by state legislation/regulation, a virtual *per se* rule of invalidity has been erected." *All. for Clean Coal v. Miller*, 44 F.3d 591, 595 (7th Cir. 1995) (internal quotation marks and citations omitted). The "[p]reservation of local industry by protecting it from the rigors of interstate competition is the hallmark of economic protection that the Commerce Clause prohibits." *Id.* at 596; *see also All. for Clean Coal v. Craig*, 840 F. Supp. 554, 562 (N.D. Ill. 1993), *aff'd sub nom. All. for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995) (holding that, to avoid invalidation pursuant to the Commerce Clause, the defendant would need to show no other reasonable means of advancing a "legitimate local

purpose," and further holding that protecting a state's local industry and economy "is not a legitimate local purpose").

<div align="center">

FACTUAL BACKGROUND

</div>

42.     The PSC is an administrative agency responsible for regulating public utilities.

43.     Specifically, the PSC is charged with the "regulation of rates and service of [certain] utilities." *See* Ky. Rev. Stat. § 278.040.

44.     By Kentucky statute, the PSC is given broad authority to ensure "rates, classifications and service of utilities" are "just and reasonable." Ky. Rev. Stat. § KRS 278.030.

45.     "Because utilities are allowed to charge consumers only 'fair, just, and reasonable rates' under KRS 278.030(1), the [PSC] must ensure that utility rates are fair, just, and reasonable to discharge its duty under KRS 278.040 to ensure that utilities comply with state law." *Kentucky Pub. Serv. Comm'n v. Com. ex rel. Conway*, 324 S.W.3d 373, 377 (Ky. 2010).

46.     Fuel costs make up a significant portion of the cost of generating electricity.

47.     Fuel prices, including the price of coal, can fluctuate widely over relatively short periods, as can the price of purchased power.

48.     By virtue of Kentucky's FAC, such utilities are permitted to adjust the rates they charge consumers, above or below the utilities' base rates, to account for these ever-fluctuating fuel costs.  *See* The Fuel Adjustment Clause: FAQs, https://psc.ky.gov/agencies/psc/consumer/FAC%20QandA.pdf (last visited April 1, 2021) [hereinafter "FAC FAQs"].

49.     In particular, the FAC works by setting a baseline fuel rate. *See* 807 Ky. Admin. Regs. 5:056(1)(1). If a regulated utility's fuel costs exceed that base rate, it may pass those fuel

<div align="center">

8

</div>

costs onto rate payers. *See id.*; FAC FAQs. But if its fuel costs fall below the base rate, it must

give rate payers a corresponding credit. *See id*.

50.     "Fuel charges that are unreasonable shall be disallowed and may result in the

suspension of the fuel adjustment clause based on the severity of the utility's unreasonable fuel

charges and any history of unreasonable fuel charges." 807 Ky. Admin. Regs. 5:056(3)(1).

51.     Every six months, the PSC conducts "a formal review and may conduct public

hearings on a utility's past fuel adjustments," and the PSC "shall order a utility to charge off and

amortize, by means of a temporary decrease of rates, any adjustments the commission finds

unjustified due to improper calculation or application of the charge or improper fuel procurement

practices." 807 Ky. Admin. Regs. 5:056(3)(3).

52.     In addition, the PSC has the authority to order a refund of any portion of fuel

costs that it determines to be unreasonable.

53.     A final review occurs at two-year intervals and results in a "disallow[ance]" of

"improper expenses," and if needed "reestablish[es] the fuel clause charge in accordance" with

the PSC's regulation. 807 Ky. Admin. Regs. 5:056(3)(4).

54.     Simply put, the PSC monitors rate adjustments under the FAC to ensure that rates

are fair, just, and reasonable. *See id.*

55.     To do so, it conducts six-month and two-year reviews of each utility's

procurement practices and disallows "unreasonable" fuel charges. *See* 807 Ky. Admin. Regs.

5:056(3).

56.     Such a disallowance forces the utilities to charge off and amortize unreasonable

fuel expenses through "a temporary decrease of rates." *Id.*

57. In this respect, the PSC has stated that its role in the six-month and two-year review process is determining "whether or not a utility has done everything it reasonably can do to *keep fuel costs as low as possible*, while maintaining a reliable fuel supply." FAC FAQs (emphasis added).

58. Utilities are required to fully document all their fuel costs.

59. This requirement includes submitting fuel purchase contracts and other materials to the PSC as part of its six-month and two-year review processes.

60. Coal remains a critical fuel source both nationwide and in Kentucky, and it is sold in an increasingly competitive interstate market.

61. Indeed, "coal-fired power plants supplied 73% of Kentucky's electricity generation" in 2019. *See* U.S. Energy Information Administration, *Profile Analysis*, https://www.eia.gov/state/analysis.php?sid=KY (last visited April 1, 2021).

62. "Historically, coal-fired power plants produced more than nine-tenths of Kentucky's net generation." *Id.*

63. In 2019, the most recent year for which government data is available, Kentucky consumed over 25,000,000 tons of coal to generate electricity. U.S. Energy Information Administration, Coal Data Browser, https://www.eia.gov/coal/data/browser/#/topic/20?agg=1,0&geo=vvvvvvvvvvvvo&sec=g&freq=A&start=2008&ctype=linechart&ltype=pin&rtype=s&pin=&rse=0&maptype=0 (last visited April 2, 2021).

64. Only four states consume more coal for electric generation than Kentucky. *See id.*

65. Thus, Kentucky is a critical market for the thermal coal business.

66.     Some states, including Kentucky, levy coal severance taxes (*i.e.*, a tax imposed on producers who extract the state's natural resources).

67.     Kentucky imposes a 4.5% coal severance tax.

68.     Other states, like Illinois, do not impose coal severance taxes.

69.     But all states impose *some* taxes on coal producers, as well as other costs that could be described as politically driven (*e.g.*, labor costs governed by a state's minimum-wage laws, corporate tax schemes, compliance costs with a state's particular environmental requirements, etc.).

70.     Coal producers in all states must account for the panoply of benefits and burdens imposed by the states in which they operate—different minimum-wage requirements, different corporate tax structures, different property, plant, equipment, and inventory taxes, different health and safety requirements (which impose different costs), and even different severance-tax schemes—to compete in the interstate market for thermal coal.

71.     Kentucky has repeatedly attempted to free its in-state coal producers from the competitive impacts of its choice to impose a coal severance tax.

72.     The attempts have been artificial, however, as Kentucky has not eliminated or reduced its severance tax.

73.     Instead, Kentucky requires utilities to deduct the cost of the coal severance tax when they make a fuel purchasing decision, even though the utilities remain obligated to pay the fully loaded price, including the portion attributable to the coal severance tax.

*House Resolution 144*

74.     This legal dispute finds its real genesis in a legislative pronouncement from early 2019.

11

75.     In particular, on March 14, 2019, the Kentucky House of Representatives adopted House Resolution 144 ("H.R. 144"). *See* Ex. A.

76.     In that resolution, the House urged the PSC to act because Kentucky coal producers were losing market share to out-of-state producers, and that declining market share was specifically attributable—according to the House—to Kentucky's higher coal severance tax. *See id.*

77.     H.R. 144 declares: (a) "the amount of coal produced in Kentucky has decreased from 109,018,240 tons in 2011 to 39,587,320 tons in 2018"; (b) "in 2018, annual coal employment declined to 6,409"; (c) "differences in severance tax policies of other states have impacted the competitiveness of Kentucky coal"; and (d) "approximately 54 percent of coal consumed in Kentucky by electric generating units was imported from Illinois, Indiana, Ohio, Pennsylvania, West Virginia, and Wyoming." *Id*.

78.     Because of Kentucky's declining market share and the House's view that severance taxes made Kentucky's coal less competitive in the interstate market, H.R. 144 directed the PSC to "amend its administrative regulations to consider all costs, including fossil fuel-related economic impacts within Kentucky, when analyzing coal purchases under the fuel adjustment clause." *Id*.

*A Letter from the Governor's Energy and Environment Cabinet*

79.     About two weeks later, Charles G. Snavely, Secretary of then-Governor Matthew G. Bevin's Energy and Environment Cabinet, e-mailed members of the PSC about H.R. 144.

80.     The letter begins by noting that "the Kentucky coal industry has experienced a decline of at least 50% within the past ten years. This decline has resulted in severe adverse

impacts upon the economies of both the eastern and western coalfields of the Commonwealth." Ex. B.

81.     The letter then notes that, "although Kentucky power plants burn approximately 25 million tons of coal annually, 13 million tons, or 54%, is imported from other states." *Id.* It then states that the "primary reason" utilities purchase coal from other states is that "the Fuel Adjustment Clause requirements in 807 KAR 5:056 cause utilities to purchase imported coals if they cost less than Kentucky coals." *Id.*

82.     The letter then crystallized the desire to incentivize purchases of in-state coal, bluntly stating:

> The fallacy in that regulatory compliance analysis is that Kentucky imposes a severance tax of 4.5% of the gross value of the sale of coals mined in Kentucky, while several other states do not impose that tax on their sales. Illinois and Indiana do not impose a severance tax at all, and Ohio's tax rate is less than 15 cents per ton. These three states alone account for half of the 13 million tons of coal imported into Kentucky each year. The discrepancy in excise tax rates often creates a perverse incentive for our own utilities to purchase coals from other states and create further economic distress in Kentucky.

*Id.*

83.     The letter concludes by "urg[ing] the PSC to amend its regulations to address the tax discrepancy issue by considering the overall economic impact to Kentucky." *Id.*

*Strike One: The PSC's Draft Regulation*

84.     Within a month of H.R. 144's adoption, on April 15, 2019, the PSC issued its first draft regulation. The draft regulation reads:

> Beginning three months after the effective date of this regulation, the Commission shall, in determining the reasonableness of fuel costs in procurement contracts and fuel procurement practices, evaluate the reasonableness of fuel costs in contracts

and competing bids based on the cost of the fuel less any tax collected under KRS 143.020.[1]

85.     In short, this draft regulation would have required utilities to evaluate

Kentucky coal producers' bid prices only after subtracting the state's coal severance tax.

In other words, it would have extended Kentucky coal producers a phantom price credit

equal to the amount of Kentucky's coal severance tax. This credit would have been

"phantom" because utilities would still have been required to pay the full bid price,

including the portion attributable to severance tax.

86.     The next day, the PSC held open proceedings involving the FAC. During

the meeting, the Chairman of the PSC (*i.e.*, Defendant Schmitt) stated on the record:

> Well, I guess the . . . bottom line is . . . the purpose of at least the portion of the regulation that deals with the Kentucky Coal Severance Tax is to either remove a disincentive or to . . . *incentivize Kentucky utilities to purchase Kentucky coal.* And that would require someone to calculate the severance tax and for purposes of reasonableness, the Commission . . . would not consider the higher price to be unreasonable . . . under the circumstances. I think that's what all the questioning ultimately goes down to is an attempt to remove from consideration the increase in cost of Kentucky coal as a result of the Kentucky Coal Severance Tax. And that request was made by the Kentucky General Assembly or House of Representatives essentially to us.

Ex. C (emphasis added).

87.     The "request" from the House of Representatives Chairman Schmitt

referenced was, of course, H.R. 144.

88.     Following the April 16, 2019, hearing, several regulated utilities

participated in the draft regulation's notice-and-comment period.

---

[1] KRS 143.020 refers to Kentucky's coal severance tax statute, which reads: "For the privilege of severing or processing coal, in addition to all other taxes imposed by law, a tax is hereby levied on every taxpayer engaged in severing and/or processing coal within this Commonwealth at the rate of four and one-half percent (4.5%) of the gross value of all coal severed and/or processed during the reporting period[.]"

89.     For example, Kentucky Power urged the PSC to delete the draft

regulation, arguing:

> The exclusion of only Kentucky's coal severance tax from the Commission's
> reasonableness review would unfairly advantage coal extracted or processed in
> Kentucky. Like any cost, severance taxes typically are included in the price paid by
> the purchaser of coal. The exclusion of Kentucky's coal severance tax only would
> artificially reduce the cost of Kentucky coal for purposes of the Commission's
> reasonableness [review] even though the cost would be borne by Kentucky Power
> and ultimately its customers. Far from leveling the basis for the Commission's
> review of fuel costs for coal produced by all states, the regulation would unfairly
> and unreasonably tilt the analysis in favor of Kentucky coal.

Ex. D.

90.     Kentucky Power also discussed the draft regulation's effects, stating that it

"arbitrarily lowers the cost of Kentucky coal for purposes of the Commission's

reasonableness analysis," which will "force utilities to purchase higher-priced coal from

Kentucky even when lower total cost coal is available from out-of-state sources." *Id.*

(providing an example of how the draft regulation would force utilities to purchase

higher-priced coal). Kentucky Power noted that this result was "contrary to the

Commission's long-standing least cost principles." *Id.*

91.     Kentucky Power argued that the PSC reasonableness review should

instead "consider the total cost paid for the coal without regard to the fuel's state of

origin." *Id.* In the alternative, Kentucky Power recommended that the regulation at least

be broadened to include all state severance taxes, not just Kentucky's. *See id.*

92.     East Kentucky Power Cooperative expressed similar concerns. *See* Ex. E.

It noted that the draft regulation was proposed because of H.R. 144, and it quoted

Chairman Schmitt's comments about "either remov[ing] a disincentive or . . .

incentiviz[ing] Kentucky utilities to purchase Kentucky coal." *Id.* And it explained that

"this attempt to encourage the purchase of Kentucky coal instead of coal from other states could be perceived as being very similar to actions taken by Illinois and Indiana in response to the 1990 Amendment to the Clean Air Act," which "encouraged the continued or increased usage of coal produced in their respective states." *Id.* And it noted that those laws were struck down as violative of the Commerce Clause. *See id.*

93.     East Kentucky Power Cooperative also argued that the draft regulation "may be trying to solve a problem that does not really exist." *Id.*

94.     Likewise, Duke Energy Kentucky, Inc., argued that the draft regulation "will change that was Duke Energy Kentucky, and likely all jurisdictional electric utilities owning coal-fired generation, procure and evaluate[] the price of coal sources to use in its resource mix." Ex. F.

95.     And Duke Energy Kentucky provided yet another example of how the draft regulation would require utilities to purchase higher-priced in-state coal. *See id.* It noted that, under the draft regulation, the in-state coal "appears arbitrarily more reasonable . . . suggesting that the utility should select" it, even though the utility will pay the "true or 'all in' cost" and "customers would end up paying more for fuel than if the [utility] had purchased the lower cost alternative." *Id.*

96.     Duke Energy Kentucky noted that the draft regulation put utilities "in the untenable position of having to act contrary to the best interests of [their] customers by purchasing more expensive coal or else be[ing] questioned on the reasonableness of [their] fuel procurement practices." *Id.*

97.     As a result of these and other concerns, Duke Energy Kentucky recommended that the PSC "should simply maintain the status quo and consider the total delivered price of coal." *Id.*

98.     Comments from Louisville Gas and Electric Company ("LG&E") echoed these sentiments. *See* Ex. G. It stated: "The proposed provision appears to violate the Dormant Commerce Clause." *Id.* It explained: "The effect of the proposed amendment is to favor Kentucky-mined coal." *Id.* (providing yet another example of how the regulation would require a utility to purchase higher-priced in-state coal).

99.     LG&E continued:

> The Commission has not identified a legitimate, non-protectionist purpose for the discriminatory treatment the proposed amendment requires. Indeed[,] the Commission's explanation demonstrates the discriminatory intent of the proposed amendment. The Commission has also failed to explain how the promotion of the Kentucky coal industry is within its statutory mandate to regulate utility rates and services and to establish "fair, just and reasonable rates."

*Id.*

100.    And LG&E then concluded that the draft regulation's

> requirement that the Commission ignore Kentucky severance tax in its assessment of an electric utility's fuel procurement decisions represents a serious legal risk to achieve a dangerous departure from longstanding least-cost principles that will result in significant adverse effects for Kentucky's ratepayers and Kentucky's economy. This provision effectively requires Kentucky electric utilities to use higher cost fuel sources if they are to recover the full cost of fuel through their rates. As a direct consequence, Kentucky ratepayers will pay more for their electric service than they otherwise would. The higher cost of electric service will make Kentucky manufacturing businesses less competitive with their out-of-state and foreign competitors and make Kentucky a less attractive place for businesses and industries to locate.

*Id.* For these reasons, LG&E, like others before it, recommended that the draft regulation be "revised to eliminate the provision regarding Kentucky severance taxes." *Id.*

101.    Big Rivers Electric Corporation opposed the draft regulation, primarily because it "could result in Kentucky residents paying more for electricity" and was inconsistent with the "guiding principle" of keeping "costs as low as possible." Ex. H. Still, Big Rivers expressed its appreciation for the PSC "efforts to protect coal jobs in Kentucky." *Id.*

102.    The only entities to support the draft regulation were two groups that stood to gain from its discrimination.

103.    First, the Kentucky Coal Association—which "is Kentucky's leading organization dedicated to advancing the interests of the coal industry across the Commonwealth" and is made up of in-state "underground and surface coal producers"—supported the draft regulation. *See* Ex. I. It explained:

> There exists presently a severance tax on Kentucky coal sold in the Commonwealth. However, certain border states, such as Indiana, do not possess a severance tax. Kentucky utilities solicit bids from both in-state and out-of-state coal suppliers. Bids from in-state coal suppliers necessarily include the assessment and obligation of the severance tax to the Commonwealth. To the extent bids from coal producers operating in border states not assessing a severance tax are lower than comparable bids from in-state producers, utilities could acquire produce for less money, but it disadvantages in-state producers and reduces the Commonwealth's tax revenue.

*Id.*

104.    Second, the Kentucky Industrial Utility Customers, Inc.—an organization comprised, in part, by large Kentucky coal producers—supported the draft regulation, but it too admitted that it "may result in slightly higher FAC costs." Ex. J.

105.    Acknowledging its serious constitutional infirmities, the PSC did not adopt the draft regulation. *See, e.g.*, Ex. K (explaining, in its Statement of Consideration, that the PSC did not adopt the draft regulation because it "understands the commenters['] concerns regarding the enforceability of the regulation under the Dormant Commerce Clause" and wanted to "address those concerns").

18

*Strike Two: The Implemented Regulation*

106.     Instead, on May 20, 2019, the PSC addressed concerns expressed in the notice-and-comment period by modifying the draft regulation's language. Instead of singling out Kentucky's coal severance tax for preferential treatment in the bidding process, the PSC amended the language to require utilities to deduct any jurisdiction's severance taxes.  In particular, the adopted regulation read:

> For any contracts entered into on or after December 1, 2019, the commission shall, in determining the reasonableness of fuel costs in procurement contracts and fuel procurement practices, evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel *less any coal severance tax imposed by any jurisdiction.*

107.     In its Statement of Consideration, the PSC acknowledged the obvious: "There are occasions when [the adopted regulation] will require utilities to select a fuel source that is slightly more expensive than the alternative based on the proposed language." *Id.* And it acknowledged that the regulation "will require utilities to obtain information from suppliers regarding the amount of taxes that have been paid or will be paid pursuant to KRS 143.020 [sic[2]] in order to evaluate the cost of coal pursuant to Section 3(5)." *Id.*

108.     But the only difference between the draft regulation and the adopted regulation was the precise scope of the discrimination.

109.     Rather than favoring in-state coal producers to the detriment of all out-of-state producers (as the draft regulation had done), the adopted regulation essentially fashioned a preferred severance-tax-state bloc of states for coal procurement.

---

[2] Given the revision, the adopted regulation would actually require utilities to obtain information from producers regarding the amount of any coal severance taxes they paid to any state.

110.     Put differently, under the adopted regulation, coal producers in states that impose a coal severance tax would receive a phantom price credit freeing them of the competitive consequences of the kind of tax Kentucky imposes and selected for preferential treatment, while producers in other states—although still required to navigate the various costs and burdens imposed by their states' political decisions—would be evaluated on their full bid prices.

111.     For example, suppose a Kentucky coal producer bid $50 per ton for a utility contract, while an Illinois coal producer bid $48 per ton. In this example, because the adopted regulation directed utilities to view the Kentucky producer's price as $47.75 per ton—a 4.5% reduction that accounts for the coal severance tax—the Kentucky coal producer would appear, artificially, to be the lowest-cost provider.

112.     Critically, the utility would still have been required to pay the Kentucky coal producer the full $50-per-ton bid price. In short, through the magic of the adopted regulation, utilities were required to treat the $48-per-ton bid from an Illinois coal producer as *more* expensive than the Kentucky coal producer's bid of $50 per ton, or else risk disallowed fuel charges, rate reductions, and suspension of the FAC (*i.e.*, the ability to pass increased fuel costs along to consumers) in the PSC's six-month and two-year review processes.

113.     But Kentucky cannot fashion a preferred severance-tax bloc of states for coal procurement.

114.     On November 29, 2019, Foresight sent a notice letter, via certified mail, to the PSC arguing that the adopted regulation unconstitutionally discriminated against interstate commerce in violation of the Dormant Commerce Clause. *See* Ex. L.

115.     On January 8, 2020, the PSC responded by letter (to both Foresight and to regulated utilities), stating that it had requested an opinion regarding the adopted regulation's

constitutionality from Attorney General Daniel Cameron. *See* Ex. M. In that letter, the PSC stated that it would suspend enforcement of the adopted regulation until the Attorney General rendered the requested opinion.

116.    On March 4, 2020, Attorney General Cameron issued an opinion that the adopted regulation did not violate the Dormant Commerce Clause because, in his opinion, it did not favor Kentucky coal producers over *all* out-of-state producers. *See* Ex. N.

117.    Specifically, the Attorney General found that "[a]n adjustment to offset coal severance taxes would cause Kentucky coal to be priced more competitively in comparison to some states and less competitively with respect to other states, depending on which states have chosen to enact severance taxes and at what rate." *Id.*

118.    The Attorney General also noted that, given Kentucky's 4.5% coal severance tax, the adopted regulation "might arguably benefit coal producers in Kentucky relative to those in Indiana and Illinois," neither of which has a severance tax. *Id.*

119.    But, he reasoned, "the same logic would mean that [the adopted regulation] could hurt Kentucky coal producers relative to those [unidentified] states where the severance tax may be higher." *Id.*

120.    And, he concluded, "nothing prevents states from altering their severance tax if they believe it will provide their coal producers with a competitive advantage in Kentucky." *Id.*

121.    On this basis, the Attorney General concluded "there is no merit to the argument that discounting severance taxes . . . will favor Kentucky coal producers to the detriment of *all* out-of-state interests." *Id.* (emphasis added).

122.     The same day the Attorney General released his opinion, the PSC sent a letter to Foresight and to regulated utilities stating that, based on the Attorney General's opinion, it would no longer suspend enforcement of the adopted regulation. *See id.*

123.     As such, on March 17, 2020, Foresight brought suit in the U.S. District Court for the Eastern District of Kentucky against members of the PSC and against Attorney General Cameron, all in their official capacities, asking for declaratory and injunctive relief based on the adopted regulation's unconstitutional discrimination against interstate commerce.

124.     At the same time, Foresight filed a motion for a preliminary injunction. The motion was fully briefed by the parties on April 7, 2020, and argued at a telephonic hearing—during the early stages of the COVID pandemic—on April 9, 2020.

125.     On May 25, 2020, the district court denied Foresight's motion for preliminary injunction, in a memorandum opinion and order that—as to Foresight's likelihood of success on the merits of the Dormant Commerce Clause challenge—Foresight continues to believe was in error.

126.     Foresight timely filed a notice of appeal to the U.S. Court of Appeals for the Sixth Circuit. The parties fully briefed the appeal on September 3, 2020, and the Sixth Circuit scheduled oral argument for December 4, 2020.

127.     Less than a week before the scheduled oral argument, counsel for the PSC reached out to Foresight and offered to remove the adopted regulation in exchange for Foresight's agreement to dismiss the appeal, stay all deadlines in the district court, dismiss the case with prejudice once the adopted regulation was removed, and not seek reimbursement of its attorneys' fees and costs associated with the case.

128.    The parties signed a settlement agreement to this effect on November 30, 2020.

*See* Ex. O.

129.    On December 1, 2020, the PSC sent a letter to regulated utilities informing them

that it would delete the adopted regulation and would not enforce it in any FAC proceedings. *See*

Ex. P.

130.    On December 14, 2020, the PSC made the required regulatory submission to the

Legislative Research Commission to delete the adopted regulation. *See* Ex. Q.

131.    On March 8, 2021, the Kentucky Administrative Regulation Review

Subcommittee discussed the deletion. In that meeting, J.E.B. Pinney, the PSC's acting general

counsel, explained the litigation and the adopted regulation's history as follows:

> In 2019, the commission, in response to a joint resolution from the legislature,
> undertook to amend many of the provisions of the fuel adjustment clause, but one
> of which was to address a request from the legislature to, I guess, incent[ivize] the
> burning of Kentucky Coal over others. And so, initially, the commission proposed
> to promulgate a reg that would only remove the cost of the Kentucky severance tax,
> but looking at the reasonableness of fuel costs for the Kentucky generators.
> However, after a public comment period, several of the generators, East Kentucky
> Power, Kentucky Power, Duke Kentucky, all raise[d] concerns about the
> constitutionality of the provision, and at which point the commission amended the
> proposed regulation to remove all severance taxes from all jurisdictions. The
> regulation was to apply to fuel contracts and entered into December 1, 2019.
> Shortly, in November of 2019, Foresight Coal sent a letter to the commission,
> threatening to sue the commission in federal court if they did not suspend the
> regulation. The commission then sought a legal opinion from the attorney general's
> office as to the constitutionality of the fuel adjustment clause. Now, the attorney
> general's office did conclude that the fuel adjustment clause was constitutional, and
> the commission went forward with enforcing the regulation. However, in March,
> or even before March of 2020, Foresight filed their suit against the commission.
> The commission engaged the offices of the attorney general for its representation,
> and the commission did prevail against a motion for a temporary injunction in
> United States District Court. However, as we – as the commission went forward
> with responding to discovery, it became evident to the commission – it might be
> best if the commission were to seek a settlement on this issue. The reason being is
> that, under 1983, if a litigant is successful against the state, they can recover
> attorney's fees as well as real damages if they – and rather than get into a long,
> drawn out jury trial, the commission concluded that it would be better to seek

settlement. And part of the settlement, where Foresight would walk away, would
be to remove this clause from the fuel adjustment clause.

Ex. R at 4:20–6:15.

132.    The adopted regulation technically remains on the books (although the PSC is not

enforcing it), but it is expected to be deleted—per the PSC's submission—in the next several

months, at which point, according to the terms of the Settlement Agreement, the previous lawsuit

must be dismissed with prejudice.

*Strike Three: Kentucky's New Law*

133.    On February 22, 2021, Senator Robby Mills and Senator Phillip Wheeler co-

sponsored a bill to amend Chapter 278—Kentucky's statutes related to the PSC—to add a

section almost identical the adopted regulation the PSC had just agreed to remove.

134.    In particular, Senate Bill 257 proposed to add the following as a new section of

KRS Chapter 278:

> In any review by the commission of any fuel adjustment clause, for any contracts
> entered into on or after July 1, 2021, the commission shall, in determining the
> reasonableness of fuel costs in procurement contracts and fuel procurement
> practices, evaluate the reasonableness of fuel costs in contracts and competing bids
> based on the cost of the fuel less any coal severance tax imposed by any jurisdiction.

S.B. 257.

135.    In all material respects, the law expressed in Senate Bill 257 is the same as the

adopted regulation.

136.    Senate Bill 257 passed the Kentucky Senate by a 36-0 vote on March 4, 2021.

Before the vote, Senator Mills explained that the law

> allows the coal severance tax that is added to coal in the State of Kentucky to be
> considered reasonable when compared with coal contracts that do not have a
> severance tax on there. And the reason that it is reasonable is because we all know
> what coal severance tax does for our community and what it returns back to the
> state, and those are benefits above and beyond just the price for consumers.

24

Ex. S at 3:16–4:13.

137.    On March 11, 2021, the House Standing Committee on Natural Resources

discussed Senate Bill 257. In those proceedings, Senator Mills described the bill as being about

"coal country." Ex. T at 2:8–11. He explained:

> If you're not aware, every so often, the PSC periodically reviews purchase contracts
> to make sure that electric utilities fuel-buying decisions are reasonable, and when
> considering whether a fuel purchase is reasonable, the PSC should—and this is
> what the bill is about—consider more than just the cost of the fuel. They should . . .
> look at factors like reliable fuel source. I know you've talked – we've talked about
> this in this committee, and in the Senate committee, about coal as a reliable fuel
> source. It's sitting there in a pile. It's ready to go. All it has to do is be burned. And
> the other thing that they should consider is the economic benefits of the severance
> tax that's paid on that coal, and those economic benefits are spread out in two ways.
> They're spread out through the state budget, and they're also spread out
> individually . . . in the communities that that fuel and that coal come from through
> the state. So a low-cost coal contract doesn't always mean that it's the most
> reasonable contract. And so what this bill does is this bill asks the Public Service
> Commission to[,] in determining the reasonableness of the fuel cost in procurement
> of the contracts for the fuel, to evaluate the reasonableness of the fuel cost in
> contracts and competing bids based on the cost of the fuel less any coal severance
> tax imposed by any jurisdiction.

Id. at 2:17–3:19.

138.    Chairman Jim Gooch—a co-sponsor of H.R. 144—then shared a story:

> I know I was taking testimony one time in a committee when I first got here, and I
> can remember, of course, the PSC at the time wanted to make sure you had the
> lowest cost or whatever, and there was one utility that testified that they were
> buying some compliant coal that was eight cents a ton cheaper than what the same
> compliant coal in Kentucky was. Now, we're talking about eight cents per ton[,]
> . . . which would not even [have] been measured in cost, and when you looked at
> it, you know, . . . the employment, the economic development, the way dollars
> turned over, the coal severance, and all of that, that certainly was not something
> that really made any sense to this . . . state, . . . and, you know, it's one thing to, you
> know, allow someone . . . to take the lowest bid or whatever, but for the state to
> actually promote something . . . like that, you know, certainly was not in our best
> interest, and so with that, are there any questions?

Id. at 3:21–4:20.

139.    Representative John Blanton then asked if the bill had "similar language" to "a reg [from] a few years ago [that] they removed." *Id.* at 5:1–4. Senator Mills explained:

> Yeah. Yeah, it is. . . . [T]he House actually passed a resolution, like 99 to one, two years ago. The PSC had this in a regulation, and . . . they're asking us to put it in [a] statute, and it gives them more firm ground to stand on in doing this.

*Id.* at 5:5–10.

140.    Representative Fitzgerald then noted that, "when the PSC had this in their regulation, they were sued by an out-of-state coal company, and they settled the case by agreeing to remove the language." *Id.* at 5:22–25. He then asked Senator Mills "how confident we are that if this goes into the statute, we're not going to get another suit saying that we're violating interstate commerce." Senator Mills responded, in relevant part:

> I think the reason the PSC did away with the regulation that they were operating under is . . . really because of the cost of pursuing that, and I think it's kind of . . . a backup situation. It's easier for them to come to the legislature and . . . ask for a statute that gives them more solid ground, and from the folks that I've talked to, I believe the statute puts them on, like I said, much more solid ground if there are any legal challenges moving forward.

*Id.* at 6:10–20. Representative Fitzgerald then expressed his hope that the Attorney General would "vigorously defend the statute if there is another challenge claiming that it was a civil rights violation" and shared his view that the PSC "acted prudently in settling that because of the potential liability that they were facing." *Id.* at 6:21–7:3.

141.    In explaining her "yes" vote on Senate Bill 257, Representative Norma Kirk-McCormick said she was "from the coal fields" and was "for" "anything that's going to support" the coal fields. *Id.* at 9:22–24.

142.    On March 15, 2021, Senate Bill 257 passed the Kentucky House of Representatives by a 93-1 vote. Before the vote, Representative Gooch explained the law this way:

[T]he PSC periodically reviews these [fuel costs] to make sure that the most reasonable fuel costs are being used. But the purpose of this bill is to make sure that the PSC understands that sometimes you may need to consider more than just cost. For instance, factors like reliable fuel sources, and other factors like economic benefits need to sometimes also be considered. A perfect example of this – I remember, several years ago, I was in a committee where we actually heard a utility testify that they had actually bought compliant West Virginia coal over Kentucky coal because it was eight cents a ton cheaper. Now, I think we all know that eight cents a ton was so miniscule that it would not have really affected the rates at all, but when you consider . . . the loss . . . of those severance taxes that went to those local communities, and the jobs, and the taxes that the state was paid . . . from the employment on those jobs, that we really would have been much better off to have paid eight cents a ton more and got the benefits of the coal severance . . . and those jobs. So many of you remember that in 2019, I had a bill that – actually, it was a resolution where we asked the Public Service Commission to consider more than just . . . the lowest cost possible, and they did that. They wrote some regulations, but they were recently sued by an out-of-state coal company. We . . . understand that these types of laws cannot run afoul of interstate commerce. That's why this bill has been drafted in a way that makes sure that any jurisdiction, not just the State of Kentucky, that provides or has severance taxes, that those would also be considered there as well. The Public Service Commission feels that it would be better for us to put this in the statute than passing a resolution such as I did in 2019, and then having them just make regulations.

Ex. U at 3:8–4:22.

143.    On March 25, 2021, Governor Beshear signed Senate Bill 257 into law. As noted above, the law will affect coal contracts entered on or after July 1, 2021.

### KENTUCKY'S NEW LAW VIOLATES THE DORMANT COMMERCE CLAUSE

144.    As noted above, a protectionist law must be struck down when it discriminates against out-of-state interests "(a) facially, (b) purposefully, *or* (c) in practical effect." *E. Ky. Res.,* 127 F.3d 540 (emphasis added). In short, Foresight must only show that the law does one of these forbidden things. But Kentucky's new law does all three.

*Kentucky's New Law Is Facially Discriminatory*

145.    Kentucky's new law—like the draft regulation and adopted regulation that preceded it—expressly favors coal producers from certain states (*i.e.*, those that, like Kentucky,

27

impose severance taxes) by requiring regulated utilities to subtract out the portion of their bids attributable to coal severance taxes, but no other taxes or costs, when evaluating competing bids for contracts.

146.    In this respect, the new law—like the draft regulation and adopted regulation before it—extends a phantom price credit to producers in severance-tax states that alters the competitive landscape of the interstate market for thermal coal.

147.    In particular, the law incentivizes accepting bids from producers in severance-tax states, like Kentucky, and discourages utilities from accepting bids from producers, like Foresight, in states, like Illinois, that do not impose severance taxes.

148.    Simply put, S.B. 257 orders differential treatment of the same freely traded good—coal—based solely on one characteristic: the state of production.

149.    Under S.B. 257, if a ton of coal is produced in Kentucky, it receives a 4.5% phantom price credit in the regulated utilities' bidding processes, but if the ton of coal is produced in Illinois, it gets no price credit, based solely on the state of production.

150.    In short, Kentucky has taken a level playing field and tilted it sharply in favor of coal producers in states like Kentucky.

151.    To avoid this discriminatory treatment, Foresight must adjust its bid prices to compensate for the favorable treatment extended to producers in states with severance taxes (*i.e.*, Foresight must not only be the lowest-priced coal producer, as it often is when evaluating full bid prices, it must also be the lowest-priced producer when compared to bids utilities must, through the magic of the new law, artificially reduce by pretending they do not include severance taxes).

152.     Indeed, the same is true for any coal producer operating in a state that does not impose a coal severance tax, and even for producers operating in states that impose coal severance taxes in amounts lower than Kentucky's 4.5% coal severance tax.

153.     Kentucky's law is thus virtually indistinguishable from the law struck down in *Limbach*. Because it is facially discriminatory, Kentucky's new law violates the Dormant Commerce Clause and must be invalidated.

*Kentucky's New Law Is Purposefully Discriminatory*

154.     Although, for the reasons described above, the Court "need not ascribe an economic protectionist motive to [Defendants] to resolve this case," the new law's history represents "the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Hunt* v. *Washington State Apple Advert. Comm'n*, 432 U.S. 333, 350–52 (1977) (quoting *Dean Milk Co. v. Madison,* 340 U.S. 349, 354 (1951)).

155.     At every turn, Kentucky has confirmed its intent to shield in-state coal producers from the rigors of the highly competitive interstate market for thermal coal.

156.     That purpose is apparent in H.R. 144, which decries declining Kentucky coal production, lost Kentucky coal jobs, and coal imports from other states, including—specifically—from producers in Illinois. It is a call to action specifically to reverse the trends of (a) diminishing in-state coal production, and (b) increased importation of out-of-state coal.

157.     It is also apparent in the letter from the Energy and Environment Cabinet, which lamented the "perverse incentive" created by requiring utilities to purchase the lowest-cost coal—namely, that the rule might sometimes require utilities to import coal from out of state when Kentucky coal is not the cheapest coal available on the interstate market instead of buying more expensive in-state coal. *See* Ex. B.

158.   The PSC's prior efforts to effect change via regulation were admittedly undertaken in response to H.R. 144. *See, e.g.*, Ex. C (admitting that the PSC proposed the draft regulation specifically to "either remove a disincentive or to . . . incentivize Kentucky utilities to purchase Kentucky coal" in response to H.R. 144); Ex. R at 4:20–6:15 (explaining that the PSC proposed the draft regulation in response to H.R. 144's "request . . . to . . . incent[ivize] the burning of Kentucky Coal over others"); Exs. M & N (admitting that the PSC promulgated the adopted regulation in response to H.R. 144).

159.   This new law, too, has repeatedly been linked to H.R. 144. *See, e.g.*, Ex. T at 3:21–4:20, 5:5–10; Ex. U at 3:8–4:22.

160.   The blatantly protectionist purpose expressed in H.R. 144 is thus at the very heart of this new law.

161.   Even worse, the law's co-sponsor repeatedly emphasized its protectionist purpose.

162.   Indeed, even though the law is written to favor producers in all severance-tax states, Senator Mills repeatedly discussed how it favored in-state coal producers by requiring the PSC to evaluate reasonableness based on what *Kentucky*'s coal severance tax does for the commonwealth. *See, e.g.*, Ex. S at 3:16–4:13 (touting what Kentucky's coal severance tax accomplishes); Ex. T at 2:17–3:19 (touting the "economic benefits" of Kentucky's coal severance tax, both to the state budget and to individual communities).

163.   It is difficult to imagine that the "economic benefits" Senator Mills sought to force the PSC to consider when evaluating reasonableness include state programs made possible by severance taxes in faraway places like Wyoming.

164.   Likewise, Representative Gooch—a co-sponsor of H.R. 144 and devoted proponent of Kentucky's new law—repeatedly lamented an instance in which a utility chose to

purchase cheaper out-of-state coal instead of more expensive in-state coal, depriving Kentucky of various economic benefits, severance taxes, and perhaps even causing it to lose coal jobs. *See* Ex. T at 3:21–4:20; Ex. U at 3:8–4:22.

165. Representative Gooch's point was always clear: The new law was intended to remedy this "problem" and force utilities to buy in-state coal, even when it is not the lowest-priced coal available on the interstate market.

166. Indeed, that has *always* been the purpose of Kentucky's various efforts—from H.R. 144 to the draft regulation to the adopted regulation to the new law.

167. There has never been a legitimate, non-protectionist purpose for Kentucky's efforts.

168. Those efforts have *always* been aimed at giving a leg up to Kentucky's coal producers and discouraging utilities from purchasing coal from out-of-state producers. And that purpose has been achieved—once again—by artificially altering the price competitiveness of Kentucky coal producers.

169. And this protectionist purpose was voiced even by those who voted in favor of the law. For example, Representative Kirk-McCormick said she was willing to do "anything that's going to support" the Kentucky coal fields. Ex. T at 9:22–24.

170. Because Kentucky's new law was enacted specifically to protect in-state interests and burden out-of-state ones, it violates the Dormant Commerce Clause and must be invalidated.

*Kentucky's New Law Discriminates in Practical Effect*

171. Because the new law is materially identical to the adopted regulation the PSC has now agreed to remove, its effects will likewise be identical.

172.    Kentucky's new law will require utilities to evaluate competing bids after excluding the portions of any bids attributable to coal severance taxes—not coincidentally, the exact tax regime Kentucky imposes.

173.    Indeed, both the PSC and Attorney General Cameron have admitted that the law will, in practice, favor producers in severance-tax states by requiring utilities to treat them as the lowest-cost producers even when they are not actually the lowest-cost producers. *See, e.g.*, Ex. K (noting that the identically phrased adopted regulation "will require utilities to select a fuel source that is slightly more expensive than the alternative based on the proposed language"); Ex. N (acknowledging that the adopted regulation's identical language would "benefit coal producers in Kentucky relative to those in Indiana and Illinois," neither of which has a severance tax).

174.    The earlier example of a utility comparing competing bids of $50 per ton from a Kentucky coal producer and $48 per ton from an Illinois coal producer is once again instructive. The law requires the utility to pretend the bid from the Kentucky coal producer is $47.75—4.5% lower than the total bid price because of Kentucky's coal severance tax. As a result, the utility will be forced—under threat of disallowed fuel costs, rate reductions, and suspension of the FAC—to purchase coal from the Kentucky producer, even though its bid is *more expensive* than the Illinois producer's and even though the utility will, in fact, pay the full $50-per-ton bid price to the Kentucky producer.

175.    In short, by virtue of the new law's phantom price credit, utilities must treat the cheaper $48-per-ton bid from an Illinois coal producer as more expensive than the Kentucky coal producer's bid of $50 per ton.

176.    And Representative Gooch repeatedly confirmed that the law's practical effect is to force utilities to select a fuel source from a producer in a severance-tax state, which is in fact

more expensive, instead of a producer in a non-severance-tax state, which is artificially made to appear more expensive via application of the law's phantom price credit. Otherwise, his lamentations about the time a utility imported cheaper coal from West Virginia instead of buying more expensive coal from Kentucky make no sense.

177.    In short, Kentucky has put its thumb on the scale by requiring utilities to pretend the portions of competitive bids attributable to coal severance taxes do not exist, which artificially alters the landscape of interstate competition in the market for thermal coal. Put simply, Kentucky is attempting to pick winners and losers in interstate commerce by enshrining in law a preference for producers that pay the kind of tax Kentucky imposes.

178.    Because Kentucky's new law discriminates against interstate commerce by singling out coal produced in certain states for favorable treatment, and denying that favorable treatment to coal from all other states, it violates the Dormant Commerce Clause and must be invalidated.

*Kentucky's Law Imposes Burdens on Interstate Commerce Far Greater than Any Local Benefits*

179.    While the new law's burdens on interstate commerce are obvious, its "local benefits" are unclear.

180.    As an initial matter, to justify the law, whatever benefits it provides must be "unrelated to economic protectionism." *Wyoming v. Oklahoma*, 502 U.S. 407, 454 (1992). That it might protect or enhance the market for Kentucky's coal producers cannot justify the law because the "[p]reservation of local industry by protecting it from the rigors of interstate competition" is precisely what "the Commerce Clause prohibits." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 (1994).

181.    Aside from protecting Kentucky's coal producers, however, it is unclear how, if at all, the new law provides any benefit.

182.    Indeed, as the utilities repeatedly acknowledged with respect to similar language and the PSC admitted with virtually identical language, the new law will require utilities to pay higher prices for energy, a cost that will ultimately be borne by Kentucky consumers in the form of higher rates.

183.    Thus, aside from the unconstitutional protection of local industry, the Regulation seems to *harm* local interests, not benefit them.

### COUNT I
### Injunctive Relief

*Preliminary Injunction*

184.    Foresight realleges and incorporates by reference all allegations in the paragraphs above.

185.    Foresight is an Illinois coal producer directly competing with bids from Kentucky coal producers for contracts awarded by utilities subject to the PSC's jurisdiction, and thus has been unconstitutionally discriminated against and competitively disadvantaged by the new law's mandate.

186.    Kentucky's law impinges Foresight's constitutional right to compete on an equal footing in interstate commerce. This injury is particular to those, like Foresight, who attempt to sell coal to Kentucky utility companies subject to the PSC's jurisdiction, causing them competitive injury.

187.    Foresight has a strong likelihood of success on the merits of its challenge to the new law because it is a "protectionist" state regulation that results in differential treatment of in-state and out-of-state economic interests, benefiting the former and burdening the latter.

188.     Indeed, the law is discriminatory in every conceivable way—facially, purposefully, and practically.

189.     It discriminates "facially" based on its language; "purposefully," as demonstrated by its legislative history; and in "practical effect" because it unconstitutionally benefits in-state coal producers and disadvantages out-of-state producers like those from Illinois who must bear a broad array of taxes and other politically driven costs but have no coal severance tax to deduct from in the new "reasonableness" analysis.

190.     Put simply, the law encourages the purchase of coal from Kentucky producers and those operating in state with Kentucky's exact tax structure by extending phantom price credits to those subjected to that preferred tax scheme, and it discourages the purchase of coal produced by those operating in states that lack Kentucky's precise tax structure.

191.      Kentucky did not enact this law to advance a legitimate local purpose; instead, it sought to protect in-state economic interests to the detriment of out-of-state businesses. Even assuming—counterfactually—that a legitimate local purpose existed, the law was neither a reasonable means nor the only reasonable means to advance it.

192.     Foresight also has a strong likelihood of success on the merits of its challenge, even if—again counterfactually—the law were not "protectionist" and directly discriminatory, because the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.

193.     When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor. *See, e.g.*, *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). The likelihood of success is a question of law for the Court.

194.     Foresight will also suffer irreparable injury if a preliminary injunction does not issue. Indeed, loss of a constitutionally guaranteed freedom is *per se* irreparable. *See, e.g.*, *id.* (noting that the loss of a constitutionally protected right "unquestionably constitutes irreparable injury").

195.     Beyond the harm to Foresight's constitutional interests, Foresight is suffering and will continue to suffer a competitive disadvantage when bidding for contracts from utilities under the PSC's jurisdiction. Put simply, under Kentucky's new law, Foresight will be forced to operate in a distorted marketplace unconstitutionally tilted in favor of producers from certain states with Kentucky's preferred tax scheme.

196.     Issuance of the preliminary injunction will not cause substantial harm to others. No substantial harm can be said to inhere in the enjoinment of a law where, as here, there is a likelihood of success of a constitutional claim.

197.     The public interest would be served by issuance of the preliminary injunction because it is always in the public interest to prevent the violation of a party's constitutional rights. It is in the public interest not to perpetuate the unconstitutional application of a state law and to prevent the unlawful competitive injury it causes.

198.     This Court has discretion to waive any security requirements under Federal Rule of Civil Procedure 65(c). No bond is required here. A preliminary injunction would merely require compliance with the Constitution, Foresight has a high likelihood of success, and Defendants do not stand to suffer economic losses should they be enjoined from enforcing the law and required to comply with the Constitution. *See, e.g.*, *Doe v. Pittsylvania Cty., Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012); *accord Campos v. I.N.S.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998). "There is no reason to require a bond in" such a case. *Hope v. Comm'r of Indiana*

*Dep't of Correction*, No. 116CV02865, 2017 WL 1301569, at *8–9 (S.D. Ind. Apr. 6, 2017)

(citing *Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010)).[3]

*Permanent Injunction*

199.    Foresight realleges and incorporates by reference all allegations in the paragraphs

above.

200.    Kentucky's new law violates the Commerce Clause of the United States

Constitution—specifically, the Dormant Commerce Clause.

201.    If a constitutional right is being threatened or impaired, irreparable injury exists as

a matter of law.

202.    Foresight has suffered an irreparable injury through the constitutional violation

and competitive injury described herein—and will continue to suffer irreparable injury unless a

permanent injunction is issued.

203.    Other remedies available at law, such as monetary damages, are inadequate to

compensate for the injury, which includes the violation of Foresight's constitutional rights and

the undermining of its ability to compete on equal footing in Kentucky's market for thermal coal.

204.    Issuance of the permanent injunction would not cause substantial harm to others.

No substantial harm exists in the enjoinment of a law where the constitutional violation alleged

is found to have occurred.

205.    Balancing the hardships between the parties, the requested remedy in equity is

warranted.

---

[3] Foresight expects to work out a schedule with opposing counsel for limited discovery and then the presentation of a motion for preliminary injunction in time for the Court to resolve the issue before the law takes effect (*i.e.*, July 1, 2021). Foresight hopes the parties will agree to such a schedule in the near future and will report that agreement to the Court when it is finalized.

206.     The public interest is served by issuance of the permanent injunction to prevent the continued violation of a constitutionally guaranteed right and the competitive injury to Foresight.

207.     Accordingly, a permanent injunction should be issued here.

COUNT II
**Declaratory Relief**

208.     Foresight realleges and incorporates by reference all allegations in the paragraphs above.

209.     Under the facts alleged herein, an actual, justiciable, and substantial controversy exists between Foresight and Defendants, who are adverse in legal interests.

210.     Foresight is an Illinois coal producer directly competing with bids from Kentucky coal producers for contracts awarded by utilities subject to the PSC's jurisdiction, and thus has been unconstitutionally discriminated against and competitively disadvantaged by the law's mandate.

211.     The law impinges Foresight's right to compete on an equal footing in interstate commerce. This injury is particular to those, like Foresight, who attempt to sell coal to Kentucky utilities subject to the PSC's jurisdiction, causing it competitive injury.

212.     Foresight seeks declaratory relief based on the specific and live grievance alleged, causing deprivation of a constitutionally guaranteed right and the associated competitive injury.

213.     The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

214.     Foresight requests that the Court declare Kentucky's new law, as expressed in Senate Bill 257, invalid and unenforceable because it violates the Commerce Clause of the United States Constitution. *See* Fed. R. Civ. P. 57; 28 U.S.C. §§ 2201, 2202.

## COUNT III
### Relief Under 42 U.S.C. §§ 1983, 1988

215.    Foresight realleges and incorporates by reference all allegations in the paragraphs above.

216.    Through the enactment and subsequent enforcement of the unconstitutional law, Defendants have deprived Foresight of the rights, privileges, and immunities secured to it by Commerce Clause of the United States Constitution. Because Defendants have deprived Foresight of its constitutional rights, relief under 42 U.S.C. § 1983 is warranted here.

217.    Specifically, Foresight is forced to operate in an interstate market that Defendants have improperly skewed to favor in-state interests by giving them a protectionist advantage in the public utility bidding process.

218.    As a result of the new law and Defendants' enforcement of it, Foresight has been—or soon will be—forced to operate in a marketplace that gives an improper advantage to coal providers in states like Kentucky who have different tax schemes than the ones utilized by Foresight's home state.

219.    To protect its constitutional rights secured by the Commerce Clause, Foresight asks this Court to grant injunctive relief prohibiting Defendants from enforcing the unconstitutional law and restoring balance to the interstate marketplace.

220.    Foresight also asks this Court for attorneys' fees pursuant to 42 U.S.C. § 1988.

221.    An award of attorneys' fees and costs is appropriate against Defendants because attorneys' fees and costs are "awarded without regard for the States' Eleventh Amendment immunity" and are intended to "reimburse[] [Plaintiff] for a portion of the expenses [it] incurred in seeking prospective relief." *Hutto v. Finney*, 437 U.S. 678 (1978).

<div align="center">**REQUEST FOR RELIEF**</div>

WHEREFORE, Plaintiff Foresight Coal Sales, LLC, respectfully requests that the Court enter judgment in its favor and against Defendants in their official capacities, as follows:

1.      Declare that Kentucky's new law, as expressed in Senate Bill 257, is invalid and unenforceable because it violates the Commerce Clause of the United States Constitution;

2.      Issue an order preliminarily and permanently enjoining Defendants from enforcing Kentucky's new law, as expressed in Senate Bill 257, and ordering the PSC's compliance with the United States Constitution;

3.      Award Foresight all costs and attorney's fees incurred in bringing this action to the extent permitted under applicable laws, including 42 U.S.C. §§ 1983, 1988; and

4.      Award all other relief as deemed just and proper.

**Plaintiff requests a jury trial as to all issues of the complaint.**

DATED: April 5, 2021

<div align="right" style="margin-left:40%">
Respectfully submitted,

*/s/Robert M. Sellards*
Robert M. Sellards, Esquire (KY Bar #92394)
BAILES CRAIG YON & SELLARDS, PLLC
401 10th Street, Suite 500
Huntington, WV 25701
Tel. (304) 697-4700
Fax. (304) 697-4714
rms@bcyon.com

*/s/Nicholas S. Johnson*
Nicholas S. Johnson*
Joshua I. Hammack*
Bailey & Glasser LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
Tel. (202) 463-2101
njohnson@baileyglasser.com
jhammack@baileyglasser.com
</div>

Christopher D. Smith*
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
Tel. (304) 345-6555
csmith@baileyglasser.com
*Pro Hac Vice applications forthcoming

Counsel for Plaintiff Foresight Coal Sales, LLC